

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KIMBERLY TINGLEY-KELLEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. |
| ) | |
| THE TRUSTEES OF THE UNIVERSITY OF ) | 08 - 750 |
| PENNSYLVANIA, a Pennsylvania non-profit ) | |
| corporation, ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT

This is an action for gender discrimination by an educational institution receiving federal funding under Title IX of the Education Amendments of 1972, *as codified at* 29 U.S.C. §§ 1681, *et seq.*, and a related Pennsylvania state law tort claim.

## THE PARTIES

1.  Plaintiff, Kimberly Tingley-Kelley (hereinafter "Plaintiff" or "Tingley-Kelley"), is an adult individual residing in this District, specifically at 8320 Thomson Road, Elkins Park, Montgomery County, Pennsylvania 19027.

2.  Defendant, the Trustees of the University of Pennsylvania (hereinafter "Penn"), is a Pennsylvania non-profit corporation with a principal place of business at 3400 Walnut Street, Philadelphia, Philadelphia County, Pennsylvania 19104.



## JURISDICTION AND VENUE

3. Jurisdiction of this Court is invoked pursuant to Title IX of the Education Amendments of 1972, *as codified at* 20 U.S.C. §§ 1681, *et seq.* This Court properly exercises jurisdiction over the subject matter of this action, which arises under federal law, based on 28 U.S.C. § 1331.

4. Jurisdiction over the supplemental state law claim is invoked pursuant to 28 U.S.C. § 1367.

5. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of the acts giving rise to Plaintiff's claims occurred in this District and because Defendant resides in this District.

## FACTUAL BACKGROUND

6. At all times relevant to this action, Penn was and continues to be an educational institution, program, or activity receiving Federal financial assistance as provided by 20 U.S.C. § 1681(a).

7. At all times relevant to this action, the University of Pennsylvania School of Veterinary Medicine (hereinafter "PennVet") was and continues to be an educational institution of professional and/or graduate higher education as provided by 20 U.S.C. § 1681(a)(1). Further, PennVet is an educational institution of professional and/or graduate higher education directly under the auspices and control of Penn.

8. Between the years of 2001 and 2007, Tingley-Kelley applied six times for admission into PennVet; PennVet rejected her applications for admission all six times.

9. During her first three applications, Tingley-Kelley was married to an active-duty pilot in the United States Air Force and had a young daughter.

10. Prior to submitting her fourth application to PennVet in 2004, Tingley-Kelley gave birth to her second child, a son.

Applications #1 and #2 (September 2001 – April 2003)

11. Tingley-Kelley first applied for admission into PennVet in the Fall of 2001. At the time of application, Tingley-Kelley had fulfilled all required and recommended prerequisites for admission, save one academic course, and was also in the process of completing a Masters in Science Degree in Biology at Temple University.

12. Despite these qualifications, PennVet denied Tingley-Kelley admission into the school in early 2002. Nevertheless, she was granted a post-denial counseling session with PennVet's Director of Admissions, Malcolm J. Keiter (hereinafter "Keiter") in April of 2002.

13. During the 2002 counseling session, Keiter actively encouraged Tingley-Kelley to continue applying to PennVet and, in the interim, to show a continued interest in becoming a veterinarian by continuing her graduate work at Temple and gaining more veterinarian experience.

14. Tingley-Kelley applied again to PennVet in the Fall of 2002; prior to her application, and consistent with Keiter's encouragement and advice, she continued to excel in her Temple graduate work and had gained considerable experience both in a biology laboratory (approximately 1600-2000 hours) and teaching. Additionally, Tingley-Kelley opted to take Organic Chemistry II for a second time in her academic career in an attempt to improve her prior grade. She did this successfully and received an "A" in the class.

15. Despite the improvement in her already acceptable academic achievements, PennVet again denied Tingley-Kelley admission in early 2003; nevertheless, she was again accepted into post-denial counseling with Keiter.

16. During her second post-denial counseling session, Keiter informed Tingley-Kelley that "things were looking good" and that she should complete the Masters program at Temple. Keiter further encouraged a third application in the Fall of 2003 and that she specifically discuss her husband's role in the Air Force in her personal statements for the next application season.

Application #3 (September 2003 – April 2004)

17. Considering Keiter's representations and encouragement, Tingley-Kelley applied to PennVet for a third time in the Fall of 2003.

18. By this point, she had graduated from the Temple Masters Program with high honors and successfully defended her oral thesis.

19. Further, at the time of her application, Tingley-Kelley had obtained 1688 hours of veterinarian experience and approximately 3600 hours of laboratory experience.

20. In the Spring of 2004, PennVet granted Tingley-Kelley a pre-admission interview with the PennVet Admissions Committee, comprised of both students and faculty. A pre-admission interview is a prerequisite to admission for any applicant to PennVet.

21. During Tingley-Kelley's interview, the majority of the questions asked and comments made by the faculty interviewers concerned Tingley-Kelley's ability to

complete the PennVet program due to her status as a wife of an active-duty Air Force pilot and the mother of a young child.

22. Following her faculty interview, a PennVet student member of the Admissions Committee specifically stated to Tingley-Kelley that PennVet probably was not "going to waste a spot on a woman who has a baby and a husband on active duty."

23. Within one week, PennVet denied Tingley-Kelley admission.

24. For a third time, PennVet offered post-denial counseling with Keiter to Tingley-Kelley. During this session, Keiter outwardly expressed his dissatisfaction with PennVet students who had children, specifically commenting on a mother who should "just graduate and get out and then have a baby and stop taking up a slot."

25. Despite these comments, however, Keiter specifically and strongly encouraged Tingley-Kelley to continue furthering her application and spend the interim period between application seasons "showing continued interest."

Application #4 (September 2004 – April 2005)

26. Again due to the continued encouragement and representations made by Keiter, Tingley-Kelley applied a fourth time for admission into PennVet in September 2004.

27. By February 2005, PennVet had failed to notify Tingley-Kelley of her status. In response to this lack of information, Tingley-Kelley contacted Keiter via email inquiring as to her status.

28. Keiter responded with an inquiry as to Tingley-Kelley's activities over the past year. Tingley-Kelley responded that she had been published in a major scientific journal, completed her Calculus requirement, and taught Biology classes at Temple.

29. Additionally, she also responded that she had been on maternity leave for much of the year and had given birth to her second child in January 2004.

30. Without any further communication from Keiter, PennVet denied Tingley-Kelley admission for a fourth time; no pre-admission interview was offered.

31. Tingley-Kelley once again opted for post-denial counseling with Keiter. At this session, Keiter informed her that she remained very competitive for a position within PennVet and continued to strongly encourage reapplication for a fifth time. Keiter also recommended Tingley-Kelley to explain her family, parental, and marital situations in revised personal statements.

Application #5 (September 2005 – April 2006)

32. Due to Keiter's representation that she was very competitive for admission, Tingley-Kelley once again applied for admission in the Fall of 2005; PennVet granted her a second pre-application interview in early 2006.

33. Despite her continued interest in becoming a PennVet student, the active and express encouragement from Keiter, and constant improvement of her academic and professional profile, the faculty interview concentrated on Tingley-Kelley's personal, family, marital, and parental statuses.

34. PennVet once again denied Tingley-Kelley admission less than a week later.

35. Rather than attending a fifth post-denial counseling session with Keiter, Tingley-Kelley drafted a letter to PennVet detailing her concerns regarding her applications for admission.

36. PennVet responded with a form letter.

Application #6 (September 2006 – April 2007)

37. For a sixth and final time, Tingley-Kelley applied for admission into PennVet in the Fall of 2006.

38. Without being chosen for a pre-admission interview, PennVet once again summarily denied her admission into the program in early 2007.

Public Comments by Defendant-Keiter

39. On June 26, 2006, a newspaper article entitled "At Vet Schools, Women Dominate," was published in the Hartford (Connecticut) Courant.

40. Keiter was quoted extensively throughout the article.

41. These quotes by Keiter exhibit an outward and intentional motive of discrimination on the basis of sex/gender by Penn and PennVet, including:

   a. "By the time [women] graduate and get through an internship, it's time to have children."; and

   b. If Penn were given two equals in a pile of male and female applicants, "we would probably take the man because they are so hard to get."

42. These comments are direct evidence of intentional discrimination by Penn and PennVet.

Relevant Statistical Evidence

43. Had Tingley-Kelley been admitted during the Fall 2005-Spring 2006 application season, she would have matriculated into the PennVet Class of 2010.

44. For the PennVet Class of 2010, 52 percent of the incoming class consisted of Pennsylvania residents, all of which received pre-admission interviews.

45. Further, it is believed and therefore averred that, since 1995, no PennVet applicant that had been granted a second pre-admission interview was subsequently denied admission.

46. Thus, Tingley-Kelley found herself in an extremely favorable statistical category at the time of her 2005-2006 application: a Pennsylvania resident receiving a second, pre-application interview.

47. Moreover, Tingley-Kelley had satisfied and surpassed all prerequisites and scoring ranges for the Class of 2010.

48. By way of comparison, a male applicant, who had very little veterinarian experience, received admission into PennVet for the Class of 2010. This male applicant, like Tingley-Kelley, received a second pre-admission interview in 2006.

## COUNT I

## SEX DISCRIMINATION PURSUANT TO TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, *AS CODIFIED AT* 20 U.S.C. §§ 1681 *ET SEQ.*

49. Plaintiff incorporates Paragraphs 1 – 48 as fully set forth herein.

50. As demonstrated above, Tingley-Kelley was qualified for admission into PennVet.

51. Despite her qualifications, and through the aforementioned conduct, acts, and/or omissions, Penn intentionally, willfully, and without justification deprived Tingley-Kelley her right to be free from discrimination in education on the grounds of her sex, as provided by Title IX.

52. Specifically, Penn's conduct, acts, and/or omissions demonstrate an intentional, willful, and unjustified use of Tingley-Kelley's parental, family, and/or marital

status in determining whether Tingley-Kelley satisfied Penn's/PennVet's policies and criteria for admission.

53. Tingley-Kelley's sex was a motivating factor in Penn's determination not to admit her into PennVet. Penn discriminated against her because of her sex, and because of parental, family, and/or marital status. Penn subjected her to conduct to which persons not in the protected class were not subject, and held her to standards to which those persons were not held. Penn's proffered reasons for not admitting Tingley-Kelley are a pretext to hide its discriminatory motivations and intentions.

54. Penn's conduct violated Title IX, and has damaged Tingley-Kelley in the manners as described more fully below.

## COUNT II

### SEX DISCRIMINATION PURSUANT TO TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, *AS CODIFIED AT* 20 U.S.C. §§ 1681 *ET SEQ.*

55. Plaintiff incorporates Paragraphs 1 – 54 as fully set forth herein.

56. As already described *supra* at Paragraph 35, Tingley-Kelley sent PennVet a complaint letter on March 8, 2006 voicing her concerns about the admissions process, specifically in regard to her status as a parent of two and wife of an Air Force pilot.

57. Tingley-Kelley believes, and therefore avers, that the denial of her sixth application to PennVet in the Fall of 2006 was in direct retaliation for her March 8, 2006 letter, in addition to any other intentional, discriminatory animus towards her.

58. Penn's conduct violated Title IX, and has damaged Tingley-Kelley in the manners as described more fully below.

## COUNT III

## FRAUDULENT MISREPRESENTATION

59.     Plaintiff incorporates Paragraphs 1 – 58 as fully set forth herein.

60.     Penn, by and through the conduct and acts of its agent, PennVet Director of Admissions Malcolm J. Keiter, fraudulently misrepresented to Tingley-Kelley her status as a candidate for admission into PennVet.

61.     During four post-denial counseling sessions with Keiter, Tingley-Kelley specifically inquired as to the likelihood of her being admitted into PennVet.

62.     Each of these inquiries were met with positive encouragement, that Tingley-Kelley was "absolutely not wasting time" in continuing to apply to PennVet, that "things were looking good" concerning her applications, and that she remained "extremely competitive" for a seat at PennVet.

63.     Additionally, Penn, by and through Keiter, furthered these representations by requesting that Tingley-Kelley expend both time and money by continuing her graduate education and volunteering for veterinarian experience.

64.     These representations were false, were known to Penn to be false when made, were material in nature, and made with an intent to deceive and defraud Tingley-Kelley and to induce her to continue applying to PennVet, despite Penn's predetermined intent to refuse her admission into the school due to the discriminatory animus described above.

65.     Penn knew that Tingley-Kelley would rely on these misrepresentations.

66. Tingley-Kelley did in fact rely on these misrepresentations as evidenced by her continued applications to PennVet and unnecessary academic and volunteer endeavors, and was further induced to continue applying to PennVet.

67. As a result of this fraudulent conduct, Tingley-Kelley was damaged in the manners as described more fully below.

## REQUEST FOR RELIEF

Penn's actions have caused Tingley-Kelley lost wages, benefits, and seniority; pain, suffering, embarrassment, and humiliation; severe mental, emotional, and physical distress; and the interruption of her career and the accompanying income and benefits associated with practice as a veterinarian.

Accordingly, Plaintiff requests this Court enter an order:

 a. Finding that Penn violated Title IX;

 b. Finding that Penn retaliated against Plaintiff in further violation of Title IX;

 c. Finding that Penn fraudulently misrepresented material facts to Plaintiff;

 d. Instating Plaintiff into the next available PennVet class, as she would have been had she not been the subject of Penn's unlawful discrimination;

 e. Awarding Plaintiff a monetary award commensurate with the cost of tuition plus fees for four years education at PennVet;

 f. Awarding Plaintiff back pay consistent with the average salary for veterinarians as published by the United States Department of Labor from the date of her first possible graduation from PennVet until the termination of this action;

 g. Awarding Plaintiff double the amount of the requested back pay because the discrimination was willful;

    h. Awarding Plaintiff front pay until her projected retirement age should this Court find that the relationship with Penn/PennVet is not suitable for Plaintiff's instatement;

    i. Awarding Plaintiff compensatory damages for out-of-pocket losses, pain, suffering, embarrassment, humiliation, and reputational harm as a result of Penn's intentional discrimination;

    j. Awarding Plaintiff all damages associated with and incurred as a consequence of Penn's fraudulent misrepresentations;

    k. Awarding Plaintiff treble damages because of Penn's fraudulent misrepresentations;

    l. Awarding Plaintiff attorney's fees, costs, interest, prejudgment interest, witness fees, and any other relief to which she is entitled.

Plaintiff demands a jury trial for all claims triable by jury.

Respectfully submitted,

_____
Kimberly Tingley-Kelley

February 14, 2008