# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KIMBERLEY TINGLEY-KELLEY,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **THE TRUSTEES OF THE** | : | |
| **UNIVERSITY OF PENNSYLVANIA,** | : | |
| **a Pennsylvania non-profit corporation,** | : | |
| **Defendant.** | : | **NO. 08-750** |

GENE E.K. PRATTER, District Judge                         JANUARY 6, 2010

Admission to the University of Pennsylvania School of Veterinary Medicine ("Penn Vet") is extremely competitive. Each year, Penn Vet receives well over one thousand applications for approximately 150 offers of admission.[1] In 2007, Penn Vet's acceptance rate of approximately 11% was equivalent to that of Penn's Law School. In such a competitive process, it would seem that an applicant alleging that she was denied admission because of her gender would face a daunting task inasmuch as there are almost always applicants arguably more qualified and there are almost always legitimate reasons for favoring one well-qualified applicant over another. But when a plaintiff presents direct evidence sufficient to support allegations of discrimination, the case must be left to a jury to decide. This is such a case.

Plaintiff Kimberley Tingley-Kelley applied to Penn Vet six times from 2002 until 2007 and was rejected each time. She has brought suit against Penn Vet for the repeated denial of her applications. Ms. Tingley-Kelley alleges that she was denied admission to Penn Vet because of

---

[1] The number of applicants and the acceptance rate vary somewhat from year to year. (See Def.'s Ex. 5(a)-(f), Profiles of Classes of 2006 to 2011.) However, year in and year out a place in an incoming class is a scarce commodity.

her gender, in violation of Title IX of the Education Amendments of 1972, 42 U.S.C. § 1681

(Count I), that Penn Vet retaliated against her after she complained of this gender discrimination

(Count II), and that Penn Vet made fraudulent misrepresentations to induce her to keep applying

(Count III).

Currently before the Court is Penn Vet's Motion for Summary Judgment on all Counts.

For the reasons discussed below, the Court will grant in part and deny in part Penn Vet's Motion

for Summary Judgment.

## I.    FACTUAL AND PROCEDURAL HISTORY[2]

### A.    Penn Vet's Admissions Process

In general, during the years in question, the Penn Vet admissions process is as follows.

First, the Associate Dean for Admissions, Malcolm Keiter, and the Associate Director for

Admissions, Roseann Herpen, review all applications and, based on their experience and

awareness of the objective characteristics of the previous year's class, they eliminate what they

consider the approximate bottom one-third from consideration. The remaining applicants have

grades and GRE scores within the range that could be accepted.  (Def.'s Ex. 3, Deposition of

Malcolm Keiter at 106-110.)

Second, the Admissions Committee, comprised of elected faculty and appointed alumni

members, spends days reviewing the remaining two-thirds of the applications, with each

application being reviewed by two Committee members, to decide which applicants should be

---

[2] The factual history is undisputed unless otherwise noted.  Where there is a factual dispute, as long as Ms. Tingley-Kelley has record support for her position, the facts are viewed in the light most favorable to her.

interviewed for possible admission. The Committee members review the objective factors in the applications, including college and, if applicable, graduate school attended, grade point average (GPA) and Graduate Record Examination (GRE) scores, as well as the applicants' veterinary and other animal-related experience, work history, personal statements, recommendations, and other miscellaneous factors. The Quantitative score on the GRE is generally more important than the Verbal score because it is considered an indicator of how an applicant will handle science courses. (Def.'s Ex. 3 at 131.) To make it easier for members of the Admissions Committee to compare applicants, Penn Vet adds the GRE percentiles together. (Def.'s Ex. 3 at 131.) With respect to GPA, the last 45 credit hours GPA, especially in science courses, is separately considered and can be a positive factor if applicants demonstrate improvement over their overall GPA. (Def.'s Ex. 3 at 114-15.)

As they review an application, Committee members make notes on an Applicant Review form, and recommend whether a candidate should be interviewed or not. Committee members look not only for high achievement, but also for distinguishing characteristics and experiences. Through this process approximately one-half of the remaining applications are rejected, and the other half, or approximately one-third of the original number, are selected for interviews. (Def.'s Ex. 3 at 116-120, 126-133, 139-147, 150-154; Def.'s Ex. 4, Affidavit of Malcolm Keiter ¶ 3.)

On interview days, the applicants selected for interviews mingle with student members of the Admissions Committee, and interview with two faculty/alumni members of the Admissions Committee, one of whom has read the candidate's application, and the other of whom is "blind," i.e., has not seen the application itself. The interview is a critical factor in the admission decision. Following the day's interviews, the Committee members meet to review the

interviewees, discuss their recommendations, and vote on the candidates.  Some are denied

admission, some are accepted, and some are placed in a hold status for an "alternate" list.  (Def.'s

Ex. 3 at 180-185, 197-206.)

**B.**     **Ms. Tingley-Kelley's Background and Applications to Veterinary School**

Ms. Tingley-Kelley graduated from the University of Massachusetts, Boston, a "+0"

school,[3] in 1989, with a B.A. in English and Psychology.  Her overall GPA, as reported by her on

her Veterinary Medical College Application Service application, was 2.67.  (See, e.g, Def.'s Ex.

2(e), Plaintiff's 2006 application to Penn Vet at Penn-TK 00636.)

In 1992, Ms. Tingley-Kelley began taking courses in anticipation of applying to

veterinary school.  In her first attempt, at Harvard University (Extension), she signed up for

Chemistry, Molecular Biology, and Algebra II, withdrew from Chemistry and Molecular Biology,

and got a "C+" in Algebra II.  (Def.'s Ex. 2(e) at Penn-TK 00638; Def.'s Ex. 9, Deposition of

Plaintiff at 46-47.)  In 1994, she began taking science courses at community colleges and got A's

and B's. (Def.'s Ex. 2(e) at Penn-TK 00638.)

In 1999, Ms. Tingley-Kelley moved to Pennsylvania and enrolled in two courses at the

University of Pennsylvania's College of General Studies: Cellular Biology and Biochemistry, and

Vertebrate Physiology.  She got a B in Cellular Biology and Biochemistry and withdrew from

Vertebrate Physiology.  (Def.'s Ex. 2(e) at Penn-TK 00638; Def.'s Ex. 9 at 51-52.)

In 2000, Ms. Tingley-Kelley began a Master's degree program at Temple University,

where her grades improved and she received B's and A's. (Def.'s Ex. 2(e) at Penn-TK 00638.)

---

[3] The Admissions Committee used school rankings based on Barron's Guide to Colleges.
(Def.'s Ex. 3 at 140-41.)  These rankings range from 0 (competitive), +1 ("very competitive"), +2
("highly competitive") and +3 ("most competitive").  (Def.'s Ex. 4 ¶ 2.)

By the time she completed her Master's degree, her overall GPA had risen to 2.98. (Def.'s Ex. 2(e) at Penn-TK 00639.)

Ms. Tingley-Kelley took the GRE examination in 2001 and again in 2005. In 2001, she scored 470 on the Verbal (the 51st percentile) and 600 on the Quantitative (the 46th percentile). In 2005, she scored 600 on the Verbal (84th percentile), and 570 on the Quantitative (39th percentile). (Def.'s Ex. 2(e) at Penn-TK 00686.)

In total, Ms. Tingley-Kelley applied to Penn Vet six times, from 2002 to 2007. Penn Vet denied Ms. Tingley-Kelley admission without an interview four times (Application Years 2002, 2003, 2005 and 2007), and twice denied her admission following an interview. (Application Years 2004 and 2006).

### i.    Application Year 2002[4]

When Ms. Tingley-Kelley first applied to Penn Vet, she had concerns about her viability for admissions because she completed her undergraduate coursework at various institutions and received her undergraduate degree in 1989, more than a decade before applying to veterinary school. (Pl.'s Ex. D, Declaration of Kimberly Tingley-Kelley ¶ 2.) Ms. Tingley-Kelley did not expect to be interviewed or admitted the first time she applied for admission to Penn Vet. (Def.'s Ex. 9 at 91.)

After being rejected, Ms. Tingley-Kelley elected to meet with Malcolm Keiter, Associate Dean of Admissions, for post-denial counseling. At this counseling session, Dean Keiter told her that it was possible that she would be admitted to Penn Vet, and that she should continue to

---

[4] For the purposes of this opinion, "Application Year" is used to refer to the year of matriculation. For example, an application submitted in September 2001, for enrollment in 2002, is referred to as "Application Year 2002."

strengthen her application by working towards completing a Master's degree in biology at Temple University.  (Pl.'s Ex. D ¶ 4.)[5]  Dean Keiter also told Ms. Tingley-Kelley that the Admissions Committee would not be as concerned about her GRE scores, given that the purpose of the GRE is to predict graduate school success and she was already doing well in her graduate program.  (Pl.'s Ex. D ¶ 5.)  Dean Keiter also pointed out that her GRE scores were within the range that was acceptable for admission.  (Pl.'s Ex. D ¶ 5.)  Finally, Dean Keiter assured Ms. Tingley-Kelley that the Admissions Committee was not particularly interested in the coursework she completed more than a decade before applying to Penn Vet, but that the Committee would focus instead on her accomplishments since that time.  (Pl.'s Ex. D ¶ 6.)

Following her 2002 application to Penn Vet, Ms. Tingley-Kelley continued her graduate work at Temple and retook Organic Chemistry, improving her grade to an "A."  (Pl.'s Ex. D ¶ 7.)

### ii.  Application Year 2003

After her application was rejected, Ms. Tingley-Kelley again met with Dean Keiter for post-denial counseling.  During this counseling, Dean Keiter told Ms. Tingley-Kelley that she was "doing all the right things" and that in her next application, she should discuss her husband's active duty status in the United States Air Force in order to explain why she had moved around so much.  (Pl.'s Ex. D ¶ 8.)

_____

[5] As noted in its Motion for Summary Judgment, Penn Vet does not concede that Ms. Tingley-Kelley's descriptions of her interactions with Penn Vet Admissions Committee members and students are accurate.  However, as the non-movant, Ms. Tingley-Kelley's descriptions must be taken as true.  See Jackson v. Univ. of Pittsburgh, 826 F.2d 230, 232 (3d Cir. 1987) ("The non-movant's allegations must be taken as true, and when these assertions conflict with those of the movant, the former must receive the benefit of the doubt.") (citation omitted).

### iii.　　Application Year 2004

By the time of her third application, for admission in the Fall of 2004, Ms. Tingley-Kelley had finished her M.S. in Biology at Temple with highest honors, had completed a successful oral defense of her thesis, and she had given birth to her daughter.  (Pl.'s Ex. D ¶ 9.)  Her graduate work at Temple consisted exclusively of science courses and her last 45 credit hours GPA was 3.73.  (Pl.'s Ex. D ¶ 10.)  Her graduate GPA was 3.705, raising her overall GPA to 3.05.  (Pl.'s Ex. D ¶ 11.)  When she applied, she heeded Dean Keiter's advice and included information in her personal statement regarding her husband's active duty status in the military.  (Pl.'s Ex. D ¶ 12.)

Ms. Tingley-Kelley passed the first "cut" and two members of the Admissions Committee, Dr. Ben Martin and Dr. Adrian Morrison, reviewed her application.  The reviewers recommended that she be interviewed.

Ms. Tingley-Kelley was subsequently interviewed by Dr. Lori Mann and Dr. Ben Martin. In answer to Dr. Martin's questions regarding Ms. Tingley-Kelley's experience in different states, she noted that her husband was on active duty in the United States Air Force.  (Def.'s Ex. 10 at Penn-TK 00794.)  Dr. Martin commented that Ms. Tingley-Kelley had "a lot on her plate" and asked what she would do if her husband were suddenly deployed, and also asked how she would deal with the care of her daughter without her husband around.  (Pl.'s Ex. D ¶ 14; Def.'s Ex. 10 at Penn-TK 00794-795.)  Dr. Mann questioned whether Ms. Tingley-Kelley could handle the rigors of the program given Ms. Tingley-Kelley's personal situation with a child and a husband on active duty in the military.  (Pl.'s Ex. D ¶ 15.)  Dr. Mann and Dr. Martin made notations on their Applicant Review forms regarding Tingley-Kelley's family situation as a mother with young children and a husband on active duty in the Air Force.  (Def.'s Ex. 2(c) at

Penn-TK 00706-00708.)  They each recommended that Ms. Tingley-Kelley be denied admission, and the Admissions Committee agreed.  (Def.'s Ex. 11, Affidavit of Dr. Benson B. Martin ¶¶ 4-11; Def.'s Ex. 12, Affidavit of Dr. Lori S. Mann ¶¶ 2-8.)

After her interview ended, on the advice of Dr. Mann and Dr. Martin, Ms. Tingley-Kelley spoke with some of the student representatives on the Admissions Committee regarding the program.  (Pl.'s Ex. D ¶ 16.)  One student told Ms. Tingley-Kelley that Penn Vet "probably would not waste a spot on a woman who has a baby and a husband on active duty."  (Pl.'s Ex. D ¶ 16.)

After Ms. Tingley-Kelley was rejected in 2004, she attended post-denial counseling with Dean Keiter, who encouraged her to reapply the following year, and suggested that she get more small animal experience to "show continued interest."  (Pl.'s Ex. D ¶ 17.)

### iv.    Application Year 2005

Ms. Tingley-Kelley applied for a fourth time for the Fall 2005 academic year.  When it became apparent that she had not been selected for an interview, Ms. Tingley-Kelley emailed Dean Keiter to inquire about the status of her application.  (Pl.'s Ex. D ¶ 18.)  He responded that the Admissions Committee wanted to know what she had done to improve her previous application.  (Pl.'s Ex. D ¶ 18.)  She informed Dean Keiter that her research was recently published in a major scientific journal, that she had been teaching basic science courses, had taken a class, had given birth to a son, and had been on maternity leave.  (Pl.'s Ex. D ¶ 18.)  Two weeks later, she received a rejection letter from Penn Vet.  (Pl.'s Ex. D ¶ 18.)

Ms. Tingley-Kelley again attended post-denial counseling with Dean Keiter.  Frustrated, Ms. Tingley-Kelley asked Dean Keiter whether she was wasting her time in applying to Penn

Vet.  (Pl.'s Ex. D ¶ 19.)  Dean Keiter told her that she was "absolutely not wasting time" in continuing to apply to Penn Vet, that she was more than competitive, and that having been granted an interview previously, she would be in the "very competitive" category.  (Pl.'s Ex. D ¶ 19.)  Dean Keiter explained that she had been rejected because the Admissions Committee was unclear as to what she had done to improve her previous application.  (Pl.'s Ex. D ¶ 19.)  Dean Keiter suggested that Ms. Tingley-Kelley write "stay at home" mother in the occupation section of the application in order to explain why she had been unable to gain more veterinary experience.  (Pl.'s Ex. D ¶ 19.)  He also suggested that she explain her marital and parental status in her personal statement so that the Admissions Committee would know "what she has been up to."  (See Def.'s Ex. 10 at Penn-TK 799.)

### v.      Application Year 2006

Ms. Tingley-Kelley re-applied in 2006.  In her application, she included "stay at home mother" on her application, and discussed her martial and parental status in her personal statement.  (Pl.'s Ex. D ¶ 20.)  This time, she was granted an interview.  (Pl.'s Ex. D ¶ 20.)

While she was waiting for her interview, she spoke with another nontraditional student, a lawyer, who was changing careers.  (Pl.'s Ex. D ¶ 20.)  This applicant had applied and been rejected the previous year, but was encouraged by Dean Keiter, in a personal note and by telephone, to reapply.  (Pl.'s Ex. D ¶ 20.)  She asked this applicant what Dean Keiter had suggested he do to "show continued interest" in the field of veterinary medicine, to which he replied, "Nothing.  I went back and practiced law and paid some bills."  (Pl.'s Ex. D ¶ 20.)  She then asked him how much animal experience he had to obtain, and he replied that he worked for a "couple of buddies who were vets, but mostly ended up giving them legal advice."  (Pl.'s Ex. D

¶ 20.)

Ms. Tingley-Kelley's application was reviewed by Dr. Jill Beech and Dr. Ben Martin.  On her Applicant Review form, Dr. Beech noted Ms. Tingley-Kelley's age, 38, that "she would be at school w/2 young children," and that she had "concerns about how she'll do in school esp. w/family, etc."  (Def.'s Ex. 2(e) at Penn-TK 640.)  Dr. Martin wrote that it "will be a tough row to hoe," and that it was "time to fish or cut bait."  (Def.'s Ex 2(E) at Penn-TK 640.)  Nevertheless, they both recommended that Ms. Tingley-Kelley be interviewed.  (Def.'s Ex. 13, Affidavit of Dr. Jill Beech ¶¶ 4-6; Def.'s Ex. 11, Affidavit of Dr. Ben Martin ¶ 10.)

Ms. Tingley-Kelley was interviewed by Dr. Gary Althouse and Dr. Colin Harvey.  During this interview, questions regarding Ms. Tingley-Kelley's background and her husband's military career were discussed.  (Pl.'s Ex. D ¶ 21.)  Dr. Harvey asked why Ms. Tingley-Kelley did not move back to Boston, where she would have more family support. (Pl.'s Ex. D ¶ 21.)  Ms. Tingley-Kelley responded that she did not believe her personal situation should be a factor considered in the admissions decision.  (Pl.'s Ex. D ¶ 21.)  Dr. Althouse asked what Ms. Tingley-Kelley had done in the past year to improve her application, to which she replied that she had taken Calculus and received an "A," had volunteered at a small animal veterinary hospital, and continued to teach basic science labs at Temple University.  (Pl.'s Ex. D ¶ 21.)

Her application was rejected a week after this interview.  (Pl.'s Ex. D ¶ 21.)  Following this denial of her application, she wrote a letter requesting reconsideration because of the alleged discriminatory treatment she received during her interview. (Pl.'s Ex. D ¶ 22; Def.'s Ex. 2(e) at Penn-TK 00645-650, 651.)  Her request for reconsideration was denied.

### vi. Application Year 2007

Ms. Tingley-Kelley applied for the sixth and final time for admission in the Fall of 2007. (Pl.'s Ex. D ¶ 23.) Her application was rejected without an interview and she did not attend post-denial counseling. (Pl.'s Ex. D ¶ 23.) The only change in her 2007 application from 2006 was some additional teaching experience. (Def.'s Ex. 9 at 226-227.)

In Application Year 2007, for the first time, Ms. Tingley-Kelley also applied to other veterinary schools in addition to Penn Vet. She applied to the University of California at Davis, Colorado State University, Cornell University, and University of Tennessee. (Def.'s Ex. 2(f) at Penn-TK 00617.) Each school denied her application. (Def.'s Ex. 9 at 31.)

### C. Ms. Tingley-Kelley Compared to other Penn Vet Applicants

Ms. Tingley-Kelley's GPA and GRE scores, using her best day GRE score, were:

GPA 3.0
GRE-V 600 (84%)
GRE-Q 570 (39%)

Ms. Tingley-Kelley's GPA and GRE scores can be compared with the ranges and averages in Penn Vet's entering class from 2002 to 2007.[6]

| Year | MEAN GPA | GPA RANGE | MEAN GRE-V | GRE-V RANGE | MEAN GRE-Q | GRE-Q RANGE |
|------|----------|-----------|------------|-------------|------------|-------------|
| **2002** | 3.5 | 2.89 - 4.0 | 572 (78%) | 370-750 (19-99%) | 687 (74%) | 460-800 (47-99%) |
| **2003** | 3.5 | 2.72 - 3.98 | 583 (81%) | 350-790 (15-99%) | 690 (72%) | 430-800 (18-99%) |

---

[6] In comparing Ms. Tingley-Kelley to other applicants who were admitted, Penn Vet did not include those applicants' last 45 hours GPA. As a result, Plaintiff argues that such a comparison is not useful.

| 2004 | 3.54 | 2.9 - 4.0 | 570 (78%) | 400-749 (30-99%) | 710 (71%) | 560-800 (40-92%) |
|------|------|-----------|-----------|------------------|-----------|------------------|
| 2005 | 3.56 | 2.95 - 4.0 | 569 (77%) | 330-760 (13-92%) | 702 (70%) | N/A |
| 2006 | 3.58 | 2.97 - 4.0 | 556 (74%) | 370-760 (23-99%) | 702 (70%) | 550-800 (35-92%) |
| 2007 | 3.56 | 2.9 - 4.0 | 577 (80%) | 400-750 (31-99%) | 711 (73%) | 560-800 (38-94%) |

(Def.'s Ex. 5(a)-(f), Class Profiles.)

Ms. Tingley-Kelley's grades and GRE scores were on the low end of the broad range accepted at Penn Vet in each of the years she applied.

### D. Dean Keiter's Comments to *The Hartford Courant*

In June 2006, Dean Keiter was quoted in an article published in *The Hartford Courant* entitled, "At Vet Schools, Women Dominate." Dean Keiter stated that if he were given equal male and female applicants, Penn Vet "would probably take the man because they are so hard to get." (Pl.'s Ex. A.) In the same interview, Dean Keiter stated that "men have a lot of options instead of college. Women don't. They have to go to college to get anywhere." (Pl.'s Ex. A.) He also stated that "by the time [women] graduate and get through an internship, it's time to have children." (Pl.'s Ex. A.)

### E. Procedural Posture

Ms. Tingley-Kelley filed this lawsuit in February 2008. After a lengthy period of discovery, Penn Vet moved for summary judgment on all counts in the Complaint. The Court heard oral argument on the motion for summary judgment on December 2, 2009, and permitted the parties to submit supplemental summary judgment briefs, which the parties subsequently filed.

## II.    STANDARD OF REVIEW

Upon motion of a party, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."  Id. at 325.  After the moving party has met its initial burden, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing, that is, the non-moving party.  Anderson, 477 U.S. at 255.

III.    **DISCUSSION**

   A.    **Title IX Gender Discrimination**

Ms. Tingley-Kelley proceeds under two theories of gender discrimination.  First, she claims that she was discriminated against simply because of her gender.  Second, she claims that she was discriminated against as a woman who has young children and a husband in the military.  Her second theory of discrimination has been labeled "sex-plus" discrimination, which is discrimination based on sex plus another characteristic.

"Sex-plus" discrimination cases were first identified by the Supreme Court in Phillips v. Martin Marietta Corp., 400 U.S. 542, 544 (1971), where the Court held that Title VII does not permit an employer to have "one hiring policy for women and another for men - each having pre-school-age children." Id. at 544. At root, however, "sex-plus" discrimination is simply a form of gender discrimination.  See Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d 107, 118 (2d Cir. 2004) ("The term 'sex plus' or 'gender plus' is simply a heuristic . . . . a judicial convenience developed in the context of Title VII to affirm that plaintiffs can, under certain circumstances, survive summary judgment even when not all members of a disfavored class are discriminated against.").  The relevant inquiry under either theory is whether the plaintiff presents evidence of sex discrimination sufficient to create a genuine issue of material fact.  See Chadwick v. Wellpoint Inc., 561 F.3d 38, 43 (1st Cir. 2009) (discussing "sex-plus" cases and noting that "regardless of the label given to the claim, the simple question posed by sex discrimination suits is whether the employer took an adverse employment action *at least in part* because of an employee's sex) (emphasis in original)).

   i.    **Applicable Legal Framework**

Title IX prohibits educational institutions from engaging in sex discrimination in

admissions. 20 U.S.C. § 1681(a). To establish a claim under Title IX, a plaintiff must show that (1) she was excluded from participation in, denied the benefits of, or subjected to discrimination in an educational program; (2) that the program receives federal financial assistance; and (3) that her exclusion was on the basis of her gender. Linson v. Trustees of the Univ. of Pa., No. 95-3681, 1996 WL 479532, at *2 (E.D. Pa. 1996), citing Bougher v. Pitt, 713 F.Supp. 139, 143-44 (W.D. Pa. 1989), aff'd on other grounds, 882 F.2d 74 (3d Cir. 1989); see also Pfeiffer v. Marion Center Area Sch. Dist., 917 F.2d 779, 780 (3d Cir. 1990) (holding that in a Title IX action, the plaintiff must prove that the challenged action occurred because of gender discrimination), abrogated on other grounds by Fitzgerald v. Barnstable Sch. Comm., 129 S.Ct. 788 (2009).

Here, it is undisputed that Penn Vet denied admission to Ms. Tingley-Kelley in each of the relevant years, and that Penn Vet receives federal financial assistance. The disputed issue is whether Ms. Tingley-Kelley's exclusion from Penn Vet was because of her gender.

Title IX does not provide an analytical framework for the evaluation of gender discrimination claims. As a result, in analyzing whether a plaintiff has presented evidence under Title IX sufficient to survive summary judgment, courts understandably often look to employment discrimination jurisprudence under Title VII. See Olmstead v. L.C. ex rel Zimring, 527 U.S. 581, 617 n.1 (1999) (Thomas, J., dissenting) ("This Court has also looked to its Title VII interpretations of discrimination in illuminating Title IX . . ."); Patruska v. Gannon Univ., No. 04-80, 2008 WL 2789260, at *3 (W.D. Pa. March 31, 2008) (noting that discrimination and retaliation claims under Title IX are governed by the same tests that govern Title VII discrimination and retaliation cases); Gossett v. Oklahoma ex rel Bd. of Regents for Langston Univ., 245 F.3d 1172, 1176 (10th Cir. 2001) ("Courts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims"). Indeed, the Court finds

Title VII jurisprudence to be particularly instructive in this case because Title IX law regarding discrimination in admissions is not well-developed.[7]

In the Title VII context, disparate treatment claims fall into two categories, depending on whether there is direct evidence of discrimination, or whether the evidence of discrimination is circumstantial. Where there is direct evidence of discrimination, courts apply the "mixed motives" test set forth in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). Where there is circumstantial evidence of discrimination, courts apply the burden shifting framework developed in McDonnell Douglas v. Green, 411 U.S. 792 (1973).

Ms. Tingley-Kelley purports to have both direct and circumstantial evidence of gender discrimination.

### ii. Direct Evidence of Discrimination

As noted, when a plaintiff presents direct evidence of discrimination, the case is appropriately analyzed under the "mixed motives" analysis established by the Supreme Court in Price Waterhouse, 490 U.S. at 258, as modified by section 107 of the Civil Rights Act of 1991, 42 U.S.C. § 2000e-2(m). Under the modified Price Waterhouse standard, a defendant is liable for discrimination upon proof that a forbidden criterion "was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). Once a plaintiff shows that there is a genuine issue of material fact as to whether discrimination was a motivating factor for an employment practice, the burden of production and persuasion shift to the defendant, and summary judgment should ordinarily be denied. See

---

[7] This dispute appears to be the first case under Title IX challenging an education institution admission decision based on direct evidence of individual disparate treatment, as opposed to challenges based on admissions policies that are alleged to favor one group of people over another.

Hankins v. City of Philadelphia, 189 F.3d 353, 368 n.8 (3d Cir. 1999); see also Martinez v. Fox Broad. Co., No. 06-04537, 2008 WL 4425099, at *3 (E.D. Pa. Sept. 30, 2008) ("If a plaintiff shows direct evidence of discrimination, he need not demonstrate anything further in order to survive summary judgment.")

A plaintiff attempting to prove discrimination with direct evidence faces a "high hurdle." Walden v. Georgia-Pacific Corp., 126 F.3d 506, 513 (3d Cir. 1999).  The direct evidence must demonstrate that the "decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." See Price Waterhouse, 490 U.S. at 277 (O'Connor, J., concurring).  Derogatory comments or stray remarks in the workplace that are unrelated to employment decisions, even when uttered by decision makers, do not constitute direct evidence of discrimination. Id.; see also Fuentes v. Perskie, 32 F.3d 759, 767 (3d Cir.1994) ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision") (internal quotation and citation omitted)).

The Court will evaluate Ms. Tingley-Kelley's claim of gender discrimination against this background.

Ms. Tingley-Kelley presents direct evidence that Admissions Committee members at Penn Vet considered her status as a mother with young children and a husband in the Air Force in their decision to reject her applications in 2004 and 2006.  The notes on Ms. Tingley-Kelley's Application Review forms reflect ostensible concerns Penn Vet Admissions Committee members had about whether she could handle the rigors of Penn Vet's academic program, given her childcare responsibilities.  (See e.g. Def.'s Ex. 2(c) at Penn-TK 00706-708; Def.'s Ex. 2(e) at Penn-TK 00640, 644.)  For example, in 2006, Dr. Beech noted on her review form for Ms.

Tingley-Kelley that Dr. Beech had "concerns about how she'll do in school esp. w/family, etc." and that Ms. Tingley-Kelley "would be at school w/2 young children."[8]  That same year, Dr. Martin wrote that it "will be a tough row to hoe," a comment that could be reasonably construed, in the context of the other evidence in this case, as referring to the difficulty Ms. Tingley-Kelley would have in juggling school and family.

Ms. Tingley-Kelley testified that her childcare responsibilities were discussed at length during each of her admission interviews.  (Pl.'s Ex. D ¶¶ 14-15.)  One interviewer allegedly asked why Ms. Tingley-Kelley did not move back to Boston, where she would have more family support.  Another questioned whether she was prepared to handle the rigors of the program and care for her daughter if her husband were suddenly deployed.

In total, the notes on her Application Review forms and the comments and questions during her interviews, viewed in the light most favorable to Ms. Tingley-Kelley, could demonstrate that Admissions Committee members discriminated against her on the basis of her gender by stereotyping her as a busy mother of young children who would have a difficult time handling both graduate school and her childcare responsibilities.  See Chadwick, 561 F.3d at 44-45 (surveying cases and noting that "unlawful discrimination occurs when an employer takes an adverse job action on the assumption that a woman, because she is a woman, will neglect her job responsibilities in favor of her presumed childcare responsibilities").

---

[8] In Dr. Beech's own affidavit, she admits that she takes family responsibilities into account when evaluating both male and female applicants.  (Def.'s Ex. 13 ¶ 5.)  Although Dr. Beech recommended that Ms. Tingley-Kelley be interviewed, which indicates that she thought Ms. Tingley-Kelley had the potential to be admitted, it is still possible that her notations about Ms. Tingley-Kelley's parental responsibilities were reviewed by other members of the Admissions Committee and played a role in the ultimate denial of Ms. Tingley-Kelley's applications.

Appellate courts in other jurisdictions have found such stereotypical comments about women as caregivers to be sufficient to overcome summary judgment in gender discrimination cases brought under different statutes, even without evidence that the plaintiff was treated differently from similarly situated males. For example, in Chadwick, the plaintiff brought a "sex-plus" discrimination claim against her employer, alleging that she did not receive a promotion because of a sex-based stereotype that women who are mothers, particularly of young children, neglect their jobs in favor of their presumed childcare responsibilities. At the time she was denied the promotion, the plaintiff in Chadwick was a mother of an 11-year-old son and six-year-old triplets. In considering whether plaintiff had presented enough evidence to permit a finding of discrimination, the court adopted a "case by case" analysis, rather than the strict "mixed motive" or McDonnell Douglas framework,[9] and held that, "[g]iven what we know about societal stereotypes regarding working women with children," stereotypical comments directed toward plaintiff regarding working women with children could lead a reasonable jury to conclude that sex discrimination was behind her employer's decision not to promote her. Id. at 45-48. One comment the court found particularly revealing was plaintiff's supervisor's explanation as to why plaintiff did not get the promotion: "It was nothing you did or didn't do. It was just that you're going to school, you have the kids and you just have a lot on your plate right now." Chadwick, 561 F.3d at 47.

In Back v. Hastings On the Hudson Union Free Sch. Dist., 365 F.3d 107 (2d Cir. 2004), a case involving a gender discrimination claim under 42 U.S.C. § 1983, the Court of Appeals for

---

[9] The court noted that under either framework, "plaintiffs must present enough evidence to permit a finding that there was differential treatment in an employment action and that the adverse employment decision was caused at least in part by a forbidden type of bias." Chadwick, 561 F.3d at 45 (internal citation and quotation omitted).

the Second Circuit addressed the questions of whether stereotyping about the qualities of mothers is a form of gender discrimination, and whether this can be determined without evidence of how the employer in question treated similarly situated fathers. The plaintiff alleged that she was denied tenure as an elementary school psychologist and subsequently terminated because her employer assumed that, as a young mother, she could not continue to demonstrate the necessary devotion to her job. Plaintiff presented evidence of discriminatory comments, including comments by her supervisor that perhaps it was not the right job for her if she had "little ones," that it "was not possible for [her] to be a good mother and have this job," and that once she obtained tenure she "would not show the same level of commitment [she] had shown because [she] had little ones at home." Id. at 115, 120. The court held that although plaintiff's case would have been stronger had she presented comparative evidence of how fathers were treated, such comparative evidence was not a requirement to survive summary judgment. Id. at 122. The court concluded that "stereotyping of women as caregivers can by itself and without more be evidence of an impermissible, sex based motive." Id.

The comments in Ms. Tingley-Kelley's case - i.e. "concerns about how she'll do in school esp. w/family, etc." and it "will be a tough row to hoe" - are strikingly similar to those found in Chadwick and Back to be evidence of impermissible, sex-based stereotyping. In fact, Dr. Martin's comment that Ms. Tingley-Kelley had "a lot on her plate" is the exact same comment the court in Chadwick found so troubling as perpetuating the stereotype that women with children may not be able to juggle their professional and childcare responsibilities. Finding Chadwick and Back persuasive, this Court holds that such stereotyping, without evidence of how similarly situated male applicants were treated by Penn Vet, is sufficient evidence to

support an inference of gender discrimination. See Back, 365 F.3d at 122 (noting that defendant was not immune from plaintiff's allegations simply because in the year Back was hired, 85% of teachers at the school were women, and 71% of these women had children because "although the jury is surely allowed to consider such comparative evidence, what matters is how *Back* was treated."). After all, the ultimate issue in any discrimination case is whether the plaintiff, *as an individual,* was discriminated against.[10] When there is direct evidence of discrimination, comparative evidence, while relevant, is not necessary.[11]

In addition, contrary to Penn Vet's contention, the notes and comments in this case, construed in the light most favorable to Ms. Tingley-Kelley, arguably were more than general statements about family responsibilities or stray remarks unrelated to the decision to deny Ms. Tingley-Kelley admission. The notes on Ms. Tingley-Kelley's Applicant Review forms were made by members of the Admissions Committee in the course of admissions interviews and

---

[10] The Court also recognizes the difficulty plaintiffs in "sex-plus" discrimination cases may encounter in obtaining evidence of how similarly situated males were treated. Information about a person's family situation is not discernable to the naked eye, and it is not clear that employers or universities keep track of such information.

[11] Had Ms. Tingley-Kelley only presented circumstantial evidence of "sex-plus" discrimination, she may have then needed to demonstrate that she was treated unfavorably as compared to the corresponding subclass of men in proving her case, though the case law is not settled in this respect. See Nesselrotte v. Allegheny Energy, Inc., No. 06-01390, 2009 WL 703395, at *11 (E.D. Pa. March 16, 2009) (granting summary judgment for defendant because "[p]laintiff has failed to present evidence of the relevant comparator under the [McDonnell Douglas test], i.e., men with dependent children); Philipsen v. Univ. of Mich. Bd. of Regents, No. 06-11977, 2007 WL 907822, at *9 (E.D. Mich. March 22, 2007) ("Plaintiff must identify similarly situated men with young children who were treated differently."). But see Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d 107, 121 (2d Cir. 2004) ("Defendants are thus wrong in their contention that [the plaintiff] cannot make out a claim that survives summary judgment unless she demonstrates that the defendants treated similarly situated men differently.") Because Ms. Tingley-Kelley presents direct evidence of discrimination, the Court need not evaluate her circumstantial case.

these forms were presumably reviewed by the entire Committee before Ms. Tingley-Kelley was denied admission. The comments and questions during Ms. Tingley-Kelley's interviews in 2004 and 2006 were made by members of the Admissions Committee on the *same day* as the respective decisions to deny Ms. Tingley-Kelley's applications. Based on these comments and questions, and their timing, a jury could infer that the decision to deny her admission was motivated by impermissible, sex-based factors.

Penn Vet argues that it would have reached the same decision denying Ms. Tingley-Kelley's applications absent any discrimination because she was not objectively qualified to gain admission.[12] However, as Penn Vet has acknowledged, Ms. Tingley-Kelley's GRE scores and GPA fell within the range of scores for applicants who were ultimately accepted in each of the years she applied. During the years in question, applicants accepted had Verbal GRE scores as low as the 13th percentile and Quantitative GRE scores as low as the 18th percentile, both lower than Ms. Tingley-Kelley's scores. (See Def.'s Ex. 5 (A)-(F), Class Profiles.) Therefore, it cannot be convincingly argued that Penn Vet did not discriminate against Ms. Tingley-Kelley because *no one* with objectively less compelling academic credentials was admitted.[13]

---

[12] At oral argument, counsel for Penn Vet conceded that applicants with objectively less compelling academic credentials than Ms. Tingley-Kelley's may have been admitted to Penn Vet during the years in question. (See Oral Argument Tr. at 6.) In any event, assuming Penn Vet could prove it would have denied Ms. Tingley-Kelley admission absent any gender discrimination, she may still be entitled to certain forms of relief, such as declaratory relief, certain injunctive relief, and attorney's fees. See 42 U.S.C. § 2000e-5(g)(2)(B); Woodson v. Scott Paper Co., 109 F.3d 913, 932 (3d Cir. 1997) (noting that in the Title VII context an employer no longer has a complete defense to liability by showing that it would have made the same adverse employment decision in the absence of a discriminatory motive).

[13] While Ms. Tingley-Kelley was turned down from the other veterinary schools she applied to in 2007, it should be noted that veterinary schools have a strong preference for in-state applicants. Thus, the fact that she was denied admission at other veterinary schools does not

Because this case involves direct evidence that may amount to discrimination, Penn Vet's evidence that Ms. Tingley-Kelley was less qualified than other applicants does not shift the burden to Ms. Tingley-Kelley to present evidence of pretext under the McDonnell Douglas framework. For this reason, Ivan v. Kent State University, No. 94-4090, 1996 WL 422496 (6th Cir. 1996), a case Penn Vet relies upon, is inapposite because Ivan turned on the strength of the plaintiff's circumstantial evidence. In Ivan, the Court of Appeals for the Sixth Circuit upheld summary judgment in favor of Kent State where the Title IX plaintiff, who had been forced out of her graduate psychology program, presented evidence that her advisor had expressed pointed concerns related to her pregnancy and ability to meet her responsibilities upon return from giving birth. Analyzing her claim under the McDonnell Douglas burden shifting framework, the court in Ivan held that plaintiff failed to show pretext because she had "not offered evidence sufficient to rebut the defendants' proffered reason that [discontinuation of the program] was prompted by her own poor performance." Id. at *3. However, the record in Ivan contained "no direct evidence of discriminatory intent by Kent State University" to support the discrimination claim. Id. Here, involving direct evidence of discrimination, Penn Vet's comparative evidence shows that there will be a jury issue as to whether, if a jury finds that gender discrimination was a factor in the denials of Ms. Tingley-Kelley's applications, Penn Vet has met its burden of proving that it would have denied her applications under any extant circumstances.

Penn Vet also contends that the only direct evidence of the intention or motivation of the Admissions Committee members accused of discriminating against Ms. Tingley-Kelley are the affidavits from these Admissions Committee members, attesting to the legitimate reasons for

unequivocally demonstrate that she was not qualified for admission to Penn Vet.

denying her applications, and explaining why they discussed certain subjects and made certain written comments. Penn Vet argues that these affidavits are the equivalent of sworn testimony, and because they are unrebutted by other evidence, Penn Vet claims the affidavits support summary judgment.

However, Ms. Tingley-Kelley offers evidence that contradicts these affidavits through the Application Review forms and through her account of the admission interviews. Her own description of these interviews may be self-serving, but "there is no rule of law that the testimony of a discrimination plaintiff, standing alone, can never make out a case of discrimination that could withstand a summary judgment motion." Weldon v. Kraft Inc., 896 F.2d 793, 800 (3d Cir. 1990). Ms. Tingley-Kelley does not have to match Penn Vet affidavit-for-affidavit to survive summary judgment. See Clark v. Clabaugh, 20 F.3d 1290, 1294 (3d Cir. 1994) ("[W]hile Rule 56(e) makes clear that the appellants were required to submit more than mere allegations in their pleadings to oppose the movants' [summary judgment motion] . . . it was not incumbent upon the plaintiffs under Rule 56 to submit counter-affidavits, albeit such affidavits could have enhanced the strength of their arguments.").[14]

In sum, Ms. Tingley-Kelley has demonstrated that there is a genuine issue of material fact as to whether her status as a mother of two young children and wife of an active Air Force

---

[14] Penn Vet also contends that its decision to reject Ms. Tingley-Kelley is protected by the long-standing rule that courts should defer to universities on academic decisions. That general rule obviously does not apply in the face of allegations that an applicant was denied admission because of gender discrimination. Indeed, the entire purpose of Title IX is to authorize interference in university decisions that are based on discriminatory factors. See Cannon v. Univ. of Chicago, 441 U.S. 677, 709 (1979) (rejecting respondent's argument that it would be unwise to subject admissions decisions of universities to judicial scrutiny at the behest of disappointed applicants because the policy issue was already resolved by Congress in passing the statute).

serviceman was a motivating factor in the rejection of her applications for admission.[15]

Although Penn Vet offers evidence, including significant evidence that a jury could ultimately find quite convincing, that Ms. Tingley-Kelley would have been denied admission without regard to her parental or marital status, a reasonable jury may otherwise find that gender was a motivating factor in denying her admission. Accordingly, Penn Vet's Motion for Summary Judgment on Count III must be denied.[16]

### B.    Title IX Retaliation

To make out a *prima facie* case of retaliation under Title IX, Ms. Tingley-Kelley must show that (1) she engaged in protected activity, (2) Penn Vet subjected her to adverse action after or contemporaneously with the protected activity, and (3) a causal link exists between the protected activity and the adverse action. Dawn v. Greater Johnstown School District, 586 F. Supp. 2d 332, 374 (W.D. Pa. 2008) (citing Weston v. Pennsylvania, 251 F.3d 420, 430 (3d Cir. 2001). Protected activities include complaints of sexual discrimination to courts, government

---

[15] In reaching this conclusion, the Court has declined to consider Dean Keiter's comments recounted in the *Hartford Courant* because these comments were not about specific applicants and the record does not indicate that they reflect an admissions policy or practice. Therefore, there is no casual link between those comments and the denial of Ms. Tingley-Kelley's applications. Nor has the Court given weight to the student representative's comment to Ms. Tingley-Kelley that Penn Vet "probably would not waste a spot on a woman who has a baby and a husband on active duty," as that is more properly considered a stray comment by a non-decision maker, which cannot be taken as direct evidence of discrimination by Penn Vet. These pieces of evidence may more properly be for an ultimate fact-finder to consider.

[16] Because Ms. Tingley-Kelley has presented sufficient direct evidence of sex discrimination to survive summary judgment, the Court need not consider whether her claim may proceed under a McDonnell Douglas theory. Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985) ("[T]he McDonnel Douglas test is inapplicable where the plaintiff presents direct evidence of discrimination."); Fakete v. Aetna Inc., 308 F.3d 335, 340 (3d Cir. 2002) (same).

agencies, or to funding recipients, such as Penn Vet. Id.

It is undisputed that Ms. Tingley-Kelley engaged in protected activity and that Penn Vet subjected her to adverse action after or contemporaneously with the protected activity. Ms. Tingley-Kelley sent a letter to Dean Keiter requesting reconsideration of the denial of her 2006 application because of, among other things, improper discussions during her interviews regarding her status as a mother with young children and wife of a husband in the military. (Def.'s Ex. 2(E) at Penn-TK 00645.) Her application in 2007 was subsequently rejected. (Def.'s Ex. 2(F) at Penn-TK 00619.)

With respect to the remaining element of causation, the Court must conclude that Ms. Tingley-Kelley has failed to come forward with any evidence connecting the denial of her 2007 application with her 2006 complaint letter. The only pieces of direct evidence in the record on this issue are the affidavits submitted by Dr. David Galligan and Dr. Mark Haskins, the two Admissions Committee members who reviewed her application in 2007. Dr. Galligan and Dr. Haskins both deny that Ms. Tingley-Kelley's 2006 letter played any role in their assessment of her application. (Def.'s Ex. 16, Galligan Aff. ¶ 4; Def.'s Ex. 17, Haskins Aff. ¶ 5.) Ms. Tingley-Kelley had the opportunity to depose Dr. Galligan and Dr. Haskins, or to produce other evidence on this issue, but failed to do so.

Penn Vet also has other evidence specific to Application Year 2007 that supports its claim that Ms. Tingley-Kelley was denied admission because she was not among the best candidates that year. Ms. Tingley-Kelley acknowledged that the only change in her application from 2006 to 2007 was some additional teaching experience. (Def.'s Ex. 9 at 226-27.) The 2007 year was an exceptionally competitive one to gain admission to Penn Vet, as the number of

applicants jumped by 180, or approximately 14%. (Def.'s Ex. 3 at 169-70; Def.'s Ex. 5(a)-(f), Class Profiles.) This evidence suggests that Ms. Tingley-Kelley was denied admission in 2007 because she submitted essentially the same unsuccessful application from 2006 in a year in which admission standards were even higher.

While Ms. Tingley-Kelley presents evidence contradicting the affidavits relating to her Count I claims, after a lengthy period of discovery, she has no evidence supporting her retaliation claim or countering the affidavits by those who reviewed her application in 2007. Ms. Tingley-Kelley argues that because it is undisputed that Drs. Galligan and Haskins would have seen the 2006 letter before recommending that she be rejected in 2007, she is entitled to an inference that Dr. Galligan and Dr. Haskins rejected her application because of this complaint letter. But her mere belief, without any record evidence, that this letter led to her rejection in 2007 does not create a genuine issue of material fact. See Fed. R. Civ. P. 56(e)(2) (requiring a party opposing summary judgment to respond by setting out specific facts showing a genuine issue for trial). Thus, the Court must grant summary judgment in Penn Vet's favor on Count II of the Complaint.

### C.     **Fraudulent Misrepresentation**

Under Pennsylvania law, a fraudulent misrepresentation claim has six elements: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. Overall v. Univ. of Pa., 412 F.3d 492, 498 (3d Cir. 2005) (citing Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994)).

Ms. Tingley-Kelley's fraudulent misrepresentation claim arises from the statements she claims Dean Keiter made to her during the post-denial counseling sessions. She alleges that Dean Keiter told her she was "absolutely not wasting time" in continuing to apply to Penn Vet, that she was "doing all the right things," that things were "looking good" concerning her applications, and that she remained "extremely competitive." (See Compl. ¶ 60-62; Def.'s Ex. 10 ¶ 19.) She alleges that Dean Keiter made such statements to "induce her to continue applying to Penn Vet, despite Penn's predetermined intent to refuse her admission to the school . . ." (Compl. ¶ 64.).

Ms. Tingley-Kelley cannot maintain a cause of action for fraudulent misrepresentation. In her deposition, Ms. Tingley-Kelley admitted that Dean Keiter never *guaranteed* that if she followed his advice, she would be granted admission. (Def.'s Ex. 9 at 95, 131, 155, 163-4, 181.)[17] For his part, Dean Keiter testified that he liked Ms. Tingley-Kelley, that he always believed she was a viable candidate, and that he was disappointed when her 2006 interview went poorly and she was subsequently rejected. (Def.'s Ex. 3 at 464-65; Def.'s Ex. 4 ¶¶ 7-9.) Penn Vet also notes that the fact that Ms. Tingley-Kelley made the first cut twice and was interviewed in 2004 and 2006, shows that she was a viable candidate that, in fact, had a chance of gaining admission.

There is no evidence in the record that Dean Keiter made a false representation regarding Ms. Tingley-Kelley's admission prospects; rather, it seems that Dean Keiter made candid comments of encouragement because he assessed Ms. Tingley-Kelley's chances of admission as

---

[17] Counsel for Ms. Tingley-Kelley confirmed at oral argument that she no evidence that Mr. Keiter guaranteed her admission. (See Oral Argument Tr. at 29.)

realistic.  See Overall, 412 F.3d at 498-99 (holding that statement by a member of university hiring committee that "I'll work it out," in response to plaintiff's request to "put odds" on her application fell short of a straightforward promise that could be reasonably relied upon to state a claim for fraudulent misrepresentation).  Even assuming, *arguendo*, that Dean Keiter's comments did amount to a promise, Ms. Tingley-Kelley could not have relied reasonably upon those comments and believed that she would be guaranteed admission if she followed the advice given to her.  Ms. Tingley-Kelley knew she had to apply again every year and did in fact apply again, an exercise that would have been unnecessary had she believed she was guaranteed admission.  In addition, it is obvious to any applicant that the precise qualifications for admission to Penn Vet, or any exclusive graduate school for that matter, change each year depending on the size and strength of the applicant pool.  Because gaining admission to Penn Vet was a moving target, even if Ms. Tingley-Kelley took the steps recommended by Dean Keiter to improve her application, there was still no *guarantee* that she would be admitted.

Other than her subjective belief that Dean Keiter's comments were the equivalent of a guarantee of admission, Ms. Tingley-Kelley has failed to present evidence sufficient to support a fraudulent misrepresentation claim.  Penn Vet is entitled to summary judgment on Count III of the Complaint.

IV.	CONCLUSION

For the reasons discussed above, the Court will deny in part and grant in part Penn Vet's Motion for Summary Judgment

BY THE COURT:

S/Gene E.K. Pratter
GENE E. K. PRATTER
UNITED STATES DISTRICT JUDGE